

2003 OCT 27 P 3:47

US DISTRICT COURT
HARTFORD CT

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

TODD A. BENNETT          :
                         :
VS.                      :    NO. 3:02CV02299(AWT)
                         :
AETNA LIFE INSURANCE COMPANY :
                         :    OCTOBER 27, 2003

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT AETNA LIFE INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

**I.    BACKGROUND**

Todd Bennett is a thirty-three year old computer consultant who worked at Accenture from 1992 until April, 1997. (Ex. 1, plaintiff's affidavit, Ex. 2, job description) In early 1997, he began to have difficulty performing his job; he experienced problems with concentration, problem solving, reading, talking and writing. He had physical symptoms of weakness, difficulty with coordination, and excessive fatigue. Dr. Mark Josel finally diagnosed the problem as copper toxicity from well water in early 1998 (AR pps. 499-500)[1] The plaintiff's copper level was originally as high as 950; normal levels are 2-30. (AR p. 154) The plaintiff had lived for twenty (20) years within five (5) miles of two copper mines

---

[1]    AR refers to the defendant's claim file submitted with its Motion, Memorandum and Statement of Material Facts.

in East Granby, Connecticut. (AR, p. 138) As of April, 1997, he stopped work, and he began receiving long term disability benefits through his employer's plan with Aetna Life Insurance Company ("the policy") as of July 6, 1997. His supervisor at Accenture described his attitude and motivation prior to that time as extremely positive and advised Aetna that Mr. Bennett's reviews had been consistently "outstanding". (Ex. 3, AR p. 368)

The plaintiff received treatment for copper toxicity as of early 1998 and his condition improved steadily.

As of August, 2001, Dr. Robban Sica, plaintiff's primary health provider, sent a letter to Aetna stating that Mr. Bennett could return to part-time work. (Ex. 4, 8/20/01 Letter, AR p.115 ) Other physicians who examined him at Gaylord Hospital in 2001 also believed that he could return on a part-time basis, leading to full-time work after a reasonable period. (Ex. 5, Dr. Jerrold Kaplan, Ex. 6, Dr. Donna Henderson, AR pps. 142, 230-3, 254) Dr. Kaplan specifically stated that he would want to re-evaluate the plaintiff one month after he resumed part-time work. (AR p. 232)

Mr. Bennett contacted Accenture during January, 2001, and requested that he resume work on a part-time basis for the company. Mr. Bennett's job prior to his disability had required him to supervise a team of programmers and computer specialists to develop customized solutions for various corporate

2

clients of Accenture. The nature of the work involved designing, building and testing business computer systems. (Ex. 2, AR 126) Eight months after his initial inquiry, as of August, 2001, Accenture had not yet offered him any part-time work. Messages sent by e-mail between Accenture managers and Aetna in July and August, 2001, indicate that Accenture was considering simply terminating Mr. Bennett, but they were concerned about the relationship between the benefits available under the Aetna policy and their planned personnel action. (Ex. 7, AR, pps. 143-147)

After receiving the inquiries about terminating the plaintiff in August, 2001, Carrie Jo Peters, Aetna's claim specialist, referred the file to a "vocational expert" to determine whether Mr. Bennett was "able to perform his own occupation" (Ex. 8, Claim Referral, AR 121) The material sent to the expert did not include reports from doctors who had recently seen the plaintiff and recommended part-time work (Dr. Kaplan, Dr. Sica), but included only reports from two Aetna medical consultants who had conducted file reviews of materials. (Dr. Lo Preto, Dr. Cole) (AR 121) Dr. Petit, an endocrinologist who had examined the plaintiff and referred him to Gaylord Hospital for an evaluation in early 2001, responded to Aetna's inquiry in August, questioning the conclusion of Aetna's medical consultants, who had only conducted file reviews. Petit recommended that before any claim decision was made, the plaintiff should see "an objective"

3

medical consultant, and he recommended two physiatrists in the Hartford area. (Ex. 9, Dr. Petit fax, AR p. 150)

As of September 4, 2001, a vocational expert, Sharon Alifantis, based her conclusion that the plaintiff could work at his own occupation upon the medical reports from Aetna's two consultants, who had conducted file reviews. (Ex. 10, AR 111-114)

The plaintiff requested *partial* disability benefits as of November 1, 2001, when he began a three month unpaid training with Bennett Avionics for twenty (20) hours a week.[2] (Ex. 1) The policy provisions include benefits for partial disability, in addition to their "Rehabilitation" provisions and long term disability benefits. (Def. Ex. A, EI-10, G-16)

On January 30, 2002, Carrie Jo Peters, a Disability Management Specialist in Aetna's Employee Benefits Division, sent Mr. Bennett a letter advising him that as of April 23, 2002, **all** of his benefits would cease because he no longer met the definition of totally disabled, although her letter misquoted the policy definition. (Ex. 11, AR61)

The Aetna policy provides that "benefits will be paid ...after Aetna receives acceptable proof of loss". (Def. Ex. A, p. G-9, "Claims", Section VI., § C)

---

[2] Bennett Avionics is a company which is in the business of supplying used aircraft electronics systems and the plaintiff was paid on commission for sales.

4

The policy defines total disability as follows:

<u>Total Disability/Totally Disabled means:</u>

a. For active regular employees with a job class code below manager, that solely because of an illness, pregnancy or accidental bodily injury, an insured employee is unable:

   (1) During the first 5 years of disability to perform the material duties of the employee's own occupation; and

   2. From then on, to work at any occupation for which such employee is, or may reasonably become, fitted by education, training or experience.

b. For Active regular employees with a job code class of manager and above, that solely because of an illness, pregnancy, or accidental bodily injury, an insured employee is unable to perform the material duties of the employee's own occupation.

(Def. Ex. A, p. G-17, Section VII, "Definitions", §29)

The policy also provides benefits for partial disability.

<u>Partial disability means</u>: a. An active regular full-time or part-time employee returns to work, but cannot fully perform the duties of his or her regular occupation solely because of an illness, pregnancy or accidental bodily injury, but: (1) is able to perform one or more, but not all, of the material and substantial duties of his or her own occupation on a full-time or part-time basis; or (2) is able to perform some or all of the duties of another occupation on a full-time or part-time basis; or (3) is earning less than 80% of pre-disability income at the time partial disability employment begins.
(Def. Ex. A, p. G-16, Section VII, "Definitions", §20)

5

The plain meaning of the policy entitled the plaintiff to partial disability benefits if he was only able to work on a part-time basis. The defendant ignored this provision of the policy when it denied the plaintiff benefits. (The policy also included a provision for a Rehabilitation program which included part-time work) Defendant's Ex. A, p. G-16, Definitions, §25.

Plaintiff appealed the claim decision and the defendant maintained its position. (AR pps. 1-3)

## II.  STANDARD FOR SUMMARY JUDGMENT

When passing upon a motion for summary judgment, the district may not resolve factual disputes or make credibility determinations, even if the case is one which eventually will be tried without a jury. In re Unisys Savings Plan Litigation, 74 F.3d 420 (3d Cir. 1996). Rather, the court must resolve any ambiguities and draw all inferences against the moving party. Cargill, Inc. v. Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991). The evidence of the party against whom summary judgment is sought must be believed. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994). The court must construe the evidence in the light most favorable to the party opposing summary judgment and deny the motion unless no construction of the evidence could support judgment in the plaintiff's favor. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993);

United States v. Certain Funds on Deposit in Scudder Tax Free Investment Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United States, 5 F.3d 523, 525 (Fed. Cir. 1993); Suarez v. Dickmont Plastics Corp., 229 Conn. 99, 105 (1994); D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434 (1980); Connell v. Colwell, 214 Conn. 242, 246-47 (1990). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

To raise a genuine issue of material fact sufficient to defeat a summary judgment motion, the opponent need not match, item for item, each piece of evidence proffered by the moving party. So long as the opponent has offered enough evidence to exceed the "mere scintilla" threshold, summary judgment is to be denied. In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. R. B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997). "If reasonable minds could differ as to the import of the evidence...and if...there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary

7

judgment." Id. at 59, quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988), and In re Japanese Elec Prods. Antitrust Litigation, 723 F.2d 238 (3d Cir. 1983) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir. 1997). Citing Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996).

"A party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law....The moving party is said to bear both the initial burden of production and the ultimate burden of persuasion on the motion....A nonmoving party, even though having the ultimate burden at trial, may indeed have no obligation to offer evidence supporting its own case unless the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact." Carmona v. Toledo, 215 F.3d 124, 132-33 (1st Cir. 2000).

A party opposing summary judgment may do so by an affidavit clarifying that party's prior deposition testimony. Ramos v. Geddes, 137 F.R.D. 11 (S.D. Tex. 1991). Hearsay evidence, while not admissible in support of a motion for summary judgment, **is** sufficient to defeat a summary judgment motion so long as there is reason to believe that the evidence can be offered in an admissible form at trial. McMillian v. Johnson, 88 F.3d 1573, 1584 (11th Cir. 1996); Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir. 1990); Tetra Technologies, Inc. v. Harter, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993); Cerniglia v. LeVasseur, 19 Conn. L. Rptr. No. 4, 119 (1997).

## III. ARGUMENT

### A. STANDARD OF REVIEW OF ERISA PLAN

In its Memorandum of Law, the defendant refers to the summary plan description language in support of its argument that the arbitrary and capricious standard of review applies in this case.

The provisions of the insurance policy, or employee benefit plan, are what is relevant, and not the language in a booklet handed out to employees by the employer. In fact, the introduction of the summary plan description contains a disclaimer.

In Firestone Tire & Rubber Co. v. Bruch, the court ruled that "consistent with the established principles of trust law... a denial of benefits challenged

9

under §1132(a)(a)(B) is to be reviewed under a de novo standard unless the benefit plan give the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan". 489 U. S. 101 (1989).  If there is explicit language reserving discretionary authority,  the court considers whether the decision was "arbitrary or capricious", and will overturn the decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pagan v. NYNEX Pension Plan, 52 F. 3d 438 , 442 (2d Cir. 1995)  The plan administrator bears te burden of proving that the arbitrary and capricious standard of review applies.  Sharkey v. Ultramar Energy Ltd., 70 F. 3d 226, 230 (2d Cir. 1995).

The Aetna policy provides that Benefits will be paid ... after Aetna receives acceptable proof of loss. (G-10, Claims, section C.)  In Kinstler v. First Reliance Life Insurance Co., the Second Circuit reviewed a policy which contained language similar to the provisions in the defendant's insurance policy, and concluded that the de novo standard of review was appropriate for interpretation of plan provisions and claim determinations.181 F. 3d 243 (2d Cir. 1999).  In that case, the policy provided that "we will pay a monthly benefit if an insured submits satisfactory proof of Total Disability to us." Id., at 251. Both the District Court and Second Circuit concluded that this type of language was insufficient to confer discretion upon the plan administrator.  In Perez v. Aetna Life Insurance

Company, the Sixth Circuit sat en banc to review the provisions of Aetna's standard LTD policy provisions. Eight judges deemed the phrase "satisfactory evidence" sufficient to preclude de novo review, and six judges concluded that the phrase was not clearly a grant of discretionary authority, that the de novo standard should apply. 150 F. 3d 550, 555-8, 558-61 (6th cir. 1998)

In Kearney v. Standard Insurance Co., the Ninth Circuit, also sitting *en banc*, found that the phrase "satisfactory written proof" was not sufficient to permit an arbitrary and capricious standard of review; a de novo review was proper. 175 F. 3d 1084 (9th Cir. 1999)

The Second Circuit emphasized in Kinstler, that "when we have deemed the arbitrary and capricious standard applicable, the policy language reserving discretion has been clear. For example, in Ganton Technologies v. National Industrial Group Pension Plan, 76 F. 3d 462, 466 (2d Cir. 1996), the plan explicitly provided that the trustees had authority to "resolve all disputes and ambiguities relating to the interpretation of the plan." The Kinstler court concluded that "if the policy is read to require 'satisfactory proof' that must be submitted to [First Reliance], then the issue is like that in Perez and Kearney, and we think the dissenters in Perez and the majority in Kearney had the better of the argument." Kinstler, at 252.

As of December 16, 2002, Aetna amended its policy language to include

11

the following:

> **V. Administration of Policy**
>
> > U.  ERISA Claim Fiduciary
> >
> > For the purpose of section 503 of Title 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA and the regulations thereunder), Aetna is, effective January 1, 1991, a fiduciary with complete authority to review all denied claims for benefits under this policy. In exercising such fiduciary responsibility, Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of the policy. Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.
>
> (Ex. 14)

It appears that after the Perez decision, Aetna decided to clarify its policy language, but the amendment set forth above is not available to assist the defendant in this matter.

The court here should apply the de novo standard to questions of policy interpretation and the fact disputes concerning the insurer's claim decision.

### B. INTERPRETATION OF POLICY PROVISIONS: PARTIAL DISABILITY BENEFITS

The policy contains a provision for partial disability benefits. There is no limitation in the policy which restricts such benefits to the first five years that benefits are paid. The definition of total disability should be compatible with the

12

other provisions of the policy. The plan provides that after five years of disability, in order to continue receiving benefits, an insured employee must be able to show that he or she "is unable ... to work at any occupation for which such employee is, or may reasonably become, fitted by education, training or experience." The policy does not clearly exclude from coverage individuals who have been determined to be capable of part-time work. In <u>Mullaly v. First Reliance Standard Life Insurance Co.</u>, the court noted that it should "review the Plan as a whole, giving terms their plain meanings. Where there are ambiguities in an ERISA plan that this Court is reviewing de novo, those ambiguities are construed in favor of the plan beneficiary. 253 F. Supp. 2d 279 (2003), <u>Fay v. Oxford Health Plan</u>, 287 F. 3d 96, 104 (2d Cir. 2002)

The plain language of this policy indicates that the insured must not be able to work full time at any occupation after five years, or the partial disability provisions of the policy are rendered meaningless. This is in contrast to the cases referred to in <u>Mullaly</u>, which interpreted a policy which did not contain a provision for partial disability benefits. <u>Mullaly</u>, at 284.

### C. CLAIM DECISION

The defendant's claim decision to terminate benefits was based primarily upon a vocational assessment which was a file review of other file reviews. In August, 2001, Aetna sent reports of its medical consultants to the vocational

specialist, who concluded that Mr. Bennett could return to work. This method of finding the plaintiff no longer eligible for benefits is comparable to that described in Grosz-Salmon v. Paul Revere Life Insurance Company, 237 F. 3d 1154 (9th Cir. 2001) In that case, the insurer relied upon its own medical consultants to conclude that an attorney could return to work, despite conflicting reports from her physicians who indicated that she may have been able to do part-time work, the District Court granted summary judgment to the participant, and the Circuit Court affirmed the decision. Id., p. 1158

The plaintiff's physicians recommended that he return to work part-time. Dr. Robban Sica emphasized that the plaintiff may have experienced permanent brain damage and that until he returned to work on a part-time basis, it would be difficult to assess his ability to resume a forty (40) our work week. (Ex. 4, Ex. 13)

Although Dr. Kaplan and Dr. Henderson testing showed that during several hours of work, the plaintiff was able to function well, both also recommended part-time work. Dr. Kaplan's conclusion that he could return full time is based upon his observation of the plaintiff's motivation and cooperation, his affect, and not demonstrated production. Dr. Kaplan emphasized that it was necessary to have a test period of part-time work to determine the plaintiff's full capabilities. (Ex. 5)

In its claim summary and letters to the plaintiff, Aetna personnel also

appear to have ignored any potentially negative findings, even by their own consultants. They make no reference to Dr. Cole's discussion of the possibility of plaintiff's symptoms as possible early signs of ALS (Lou Gehrig's disease).

For all of these reasons, the defendant's decision to terminate benefits was not reasonable and it was not supported by substantial evidence. An inference can also be drawn from the e-mails exchanged between Aetna and its client, Accenture, concerning the plaintiff's status in August, 2001, that the defendant's reasons for its handling of plaintiff's disability claim after that date were influenced by the employer's interest in terminating his employment. (Ex. 7) In any case, it appeared that the employer also believed that the plaintiff was entitled to partial disability benefits under the terms of the policy.

## IV.   CONCLUSION

For the reasons set forth above, the plaintiff respectfully requests that the Motion for Summary Judgment be denied.

THE PLAINTIFF

BY: *[signature]*
KATRENA ENGSTROM
Fed. Bar No. ct09444
Williams and Pattis, LLC
51 Elm Street
New Haven, CT 06510
TELEPHONE: (203)562-9931
FAX: (203)776-9494

## CERTIFICATION OF SERVICE

On the date above stated, a copy hereof was mailed to Attorney Vaughan Finn at Shipman & Goodwin LLP, One American Row, Hartford, CT 06103-2819.

*[signature]*
KATRENA ENGSTROM