LEXSEE 1999 U.S. DIST. LEXIS 10899

**MICHAEL FRIEDMAN, Plaintiff, -v- CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., and METROPOLITAN LIFE INSURANCE COMPANY, Defendants.**

**97 CIV. 2735 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1999 U.S. Dist. LEXIS 10899*

**July 19, 1999, Decided**
**July 20, 1999, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted with respect to first four causes of action. Defendants' motion denied with respect to fifth cause of action. Plaintiff's motion for summary judgment and motion in limine denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer moved for summary judgment and plaintiff employee filed a cross-motion for summary judgment in plaintiff's complaint alleging that defendant violated *29 U.S.C.S. § 623* et seq., N.Y. Human Rights Law art. 15, *42 U.S.C.S. § 12101* et seq., and that defendant improperly denied plaintiff benefits to which he was entitled under a long-term disability plan.

**OVERVIEW:** Plaintiff employee alleged that defendant employer violated the ADEA, *29 U.S.C.S. § 623* et seq., and N.Y. Human Rights Law art. 15, by improperly terminating his employment on the basis of age. Plaintiff further alleged that defendant violated the ADA, *42 U.S.C.S. § 12101* et seq., and N.Y. Human Rights Law art. 15, by improperly terminating plaintiff's employment because of a disability stemming from knee injuries. Plaintiff also alleged that defendants improperly denied him benefits to which he was entitled under a long-term disability plan (LTD). The court held that plaintiff did not show that he was qualified to do the work from which he was discharged, thus he did not meet his initial "minimal" burden for proving age discrimination. Similarly, plaintiff failed to make out a prima facie under

the ADA, by not alleging that he was a "qualified individual." The court therefore granted defendant summary judgment with respect to plaintiff's age and disability claims. Summary judgment was inappropriate on plaintiff's claim for benefits under the LTD given the existence of material questions of fact as to the arbitrary and capricious nature of the benefit determination.

**OUTCOME:** The court granted defendants' motion for summary judgment with respect to plaintiff's causes of action for age and disability discrimination on the grounds that plaintiff failed to make out a prima facie case. Defendants' motion for summary judgment was denied with respect to the cause of action alleging improper denial of benefits under the long-term disability plan. Plaintiff's motion for summary judgment and motion in limine were denied.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Civil Procedure > Summary Judgment > Burdens of Production & ProofCivil Procedure > Summary Judgment > Summary Judgment Standard*
[HN1] Summary judgment may not be granted unless the submissions of the parties taken together show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. When the moving party has asserted facts

showing that the non-movant's claims cannot be sustained, the opposing party must set forth specific facts showing that there is a genuine issue for trial, and cannot rest on the mere allegations or denials of his pleadings. Fed. R. Civ. P. 56(e).

*Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions*
[HN2] The Age Discrimination in Employment Act applies to employees who are over the age of forty and prohibits employers from discriminating in the discharge of employees based on their age. *29 U.S.C.S. § § 623(a)(1), 631(a).*

*Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions*
[HN3] The Second Circuit has adopted the following burden shifting approach under the Age Discrimination in Employment Act: First, the plaintiff must establish a prima facie case of discrimination. The burden then shifts to the employer to rebut the prima facie case by providing a legitimate, non-discriminatory reason for its actions. The plaintiff then has the opportunity to show that the reason offered by the employer was not its true reason, and that age was. The question that must be asked is whether the plaintiff has shown, by a preponderance of the evidence, that he has been the victim of age discrimination.

*Labor & Employment Law > Discrimination > Age Discrimination > Coverage & Definitions*
[HN4] Plaintiff's initial burden to establish a prima facie case of age discrimination, although minimal, requires a showing of the following: (1) plaintiff was within the protected age group, (2) plaintiff was qualified for the job, (3) plaintiff was discharged, and (4) discharge occurred under circumstances giving rise to an inference of age discrimination. Once the employer has stated a non-discriminatory reason, the presumption of discrimination disappears and plaintiff, in order to defeat summary judgment, must present evidence sufficient to allow a rational factfinder to infer that the employer was actually motivated in whole or in part by age discrimination. In attacking an employer's proffered explanation as pretextual, plaintiff must show not only pretext, but also either use of a pretext that itself implies a discriminatory stereotype, or use of pretext to hide age discrimination. As a result, the fact that the proffered reason was false, does not necessarily mean that the true motive was the illegal one argued by plaintiff.

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions*
[HN5] A prima facie case under the Americans with Disabilities Act (ADA) requires a plaintiff to show that:

(1) the employer is subject to the ADA; (2) the plaintiff suffers from a disability within the meaning of the ADA; (3) the plaintiff could perform the essential functions of his job with or without reasonable accommodation; and (4) the plaintiff was fired because of his disability. The requirement that a plaintiff show that he could perform the essential functions of his job with or without reasonable accommodation is derived from the fact that the ADA limits its protection from discrimination to a "qualified individual with a disability." *42 U.S.C.S. § 12112(a).*

*Labor & Employment Law > Discrimination > Disability Discrimination > Coverage & Definitions*
[HN6] The Americans with Disabilities Act provides the following definition of a qualified individual: The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. *42 U.S.C.S. § 12111(8).* This qualified individual inquiry essentially boils down to examining what conduct is symptomatic of the handicap, what conduct the job in question requires, and how these two interact. The plaintiff bears the burden of production and persuasion with respect to whether he is otherwise qualified. Once the plaintiff has established a prima facie case, then a burden shifting approach applies similar to that with respect to the Age Discrimination in Employment Act.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA)*
[HN7] See *29 U.S.C.S. § 1002(1).*

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Exempt Plans*
[HN8] See *29 C.F.R. § 2510.3-1(j).*

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption*
[HN9] See *29 U.S.C.S. § 1144(a).*

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Federal Preemption*
[HN10] With respect to preemption of state common law claims, a two-part inquiry governs: (1) whether the claim is related to an employee benefit plan and if so, (2) whether there is an exception under the Employee Retirement Income Security Act that precludes preemption of the state law. The "related to" requirement has been deemed to be met where the cause of action makes specific reference to, and indeed is premised on, the existence of a plan.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies*

[HN11] See *29 U.S.C.S. § 1132*(a)(1)(B).

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies*

[HN12] Civil suits by beneficiaries to recover benefits under an Employee Retirement Income Security Act (ERISA) plan can be brought only under the civil enforcement provision of ERISA, *29 U.S.C.S. § 1132*(a).

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies*

[HN13] There is no right to a jury in claims to recover Employee Retirement Income Security Act benefits.

*Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA)*

[HN14] In Employee Retirement Income Security Act § 502(a)(1)(B) cases, a denial of benefits is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. When the plan does grant discretion over eligibility, then the court should not disturb the administrator's ultimate conclusion unless it is "arbitrary and capricious." The party seeking deferential review bears the burden of proving that the arbitrary and capricious standard applies. Under the "arbitrary and capricious" standard, the court must find the decision was without reason, unsupported by substantial evidence or erroneous as a matter of law. This scope of review is narrow, thus the court is not free to substitute its own judgment.

**COUNSEL:** For plaintiff: Daniel H. Greenberg, New York, NY.

For Consolidated Edison, defendant: Mary K. Schuette, Geraldine R. Eure, Consolidated Edison Company of New York, New York, NY.

For Metropolitan Life Insurance Company, defendant: Sondra Model Hirsch, Law Office of Donald J. Harman, Esq., New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINIONBY:** DENISE COTE

**OPINION:**

OPINION and ORDER

DENISE COTE, District Judge:

Plaintiff worked for Consolidated Edison of New York, Inc. ("Con Edison") for over 27 years until his employment was terminated. Plaintiff filed this action on April 18, 1997. The first two causes of action allege that defendant Con Edison violated the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 623* et seq., and Article 15 of the Human Rights Law of the State of New York by improperly terminating plaintiff's employment on the basis of his age. The third and fourth causes of action allege [*2]  that Con Edison violated the American with Disabilities Act ("ADA"), *42 U.S.C. § 12101* et seq., and Article 15 of the Human Rights Law of the State of New York by improperly terminating plaintiff's employment because of a disability stemming from injuries to his knees. The fifth cause of action alleges that Con Edison and defendant Metropolitan Life Insurance Company ("Met Life") improperly denied plaintiff benefits to which he was entitled under Con Edison's long-term disability plan.

Following the close of discovery, defendants served a motion for summary judgment. With his papers in opposition, plaintiff also served a cross-motion for summary judgment, and a motion to amend the complaint. By Memorandum Opinion and Order dated March 31, 1999, this Court denied plaintiff's motion to amend the complaint to add, among others, causes of action related to a condition of dementia, and the parties completed briefing of defendants' motion for summary judgment. For the reasons stated, defendants' motion for summary judgment is granted in part and denied in part. Plaintiff's motion for summary judgment and an accompanying motion in limine are denied. n1

n1 Plaintiff's motion for summary judgment appears to be largely made with respect to the age discrimination and disability claims. Plaintiff's motion is denied as moot to the extent that it deals with those claims, since they are dismissed by this Opinion and Order. The only portion of plaintiff's motion that relates to a claim not dismissed is the argument that defendants should be collaterally estopped from contending that plaintiff is not disabled because of the determination of an ALJ, which could be interpreted as applying to plaintiff's claim for long-term disability benefits. As discussed below, there is no basis for such an argument. See infra note 9. The only remaining motion by plaintiff is a motion in limine that objects to the evidence as a whole presented by the defendants with respect to all of their claims, but the Court finds that

argument to have no merit with respect to the specific evidence offered by the defendants. On these grounds, the Court deems it proper to dismiss plaintiff's motion for summary judgment and motion in limine at this time.

[*3]

## BACKGROUND

Plaintiff's Sick Leave

The following facts are undisputed or as claimed by the plaintiff, unless otherwise noted. n2 Plaintiff was an employee at Con Edison from October 21, 1968, until the termination of his employment effective November 1, 1995. On January 12, 1995, plaintiff, complaining of knee problems, ceased working at Con Edison and began receiving sick pay in accordance with Con Edison's policy, which entitled him to 47 weeks of sick leave. At the time he ceased working, plaintiff was a Senior Specialist working as a Transportation Administrator. Con Edison requires an employee on sick leave to submit to periodic examinations to determine whether the employee is able to return to work.

n2 Neither side has made any effort to make the employment and medical record at issue in the case intelligible to the Court. Instead, the defendants have merely provided a copy of plaintiff's entire medical history and claims file without placing the documents in any particular order, providing any translation of the largely illegible handwriting, or any explanation of the procedures underlying the numerous forms used by Con Edison. The plaintiff has done the same with respect to plaintiff's Social Security Administration file and a number of insurance policies and has also submitted entire depositions without a synopsis or any citations. Both the plaintiff and defendants have provided the pieces, but have very regrettably required the Court to do their work for them by assembling the puzzle. Under different circumstances, such a factual presentation may preclude the granting of summary judgment on any claims.

[*4]

Plaintiff had complained of pains in both knees and had an MRI of both knees in December 1994. On January 25, 1995, Con Edison completed a report on plaintiff's sick leave for his knee injuries that indicated that plaintiff was scheduled for surgery and that plaintiff could work with restrictions approximately four to six weeks after surgery. On January 25, 1995, plaintiff

underwent arthroscopic surgery on his left knee, performed by Dr. Dante Sesin. On June 6, 1995, plaintiff underwent arthroscopic surgery on his right knee, this time performed by Dr. Malik Akhtar. Since having surgery on both of his knees, plaintiff states that he has had to use a cane or crutches to walk.

After both surgeries, plaintiff's treating physicians completed a series of Con Edison's forms entitled "Employee's Physician Progress Report" in connection with their regular examinations of the plaintiff, and these forms became part of plaintiff's file at Con Edison. One of the lines on the progress reports requires the physician to indicate the "date employee can work with restrictions." For the first few months after the left knee surgery, plaintiff's Drs. Sesin and Parnes extended his sick leave on a month-to-month [*5] basis. Beginning on May 1, 1995, however, the sick leave is extended on an "indeterminate basis" and the May 25, 1995 progress report leaves blank this particular entry. The July 27, 1995 progress report answers this question with the words "none available." Dr. Sesin ceased filling out progress reports during this time, and Dr. Akhtar began filling them out instead. Two progress reports were completed by plaintiff's two treating physicians on September 7, 1995. The report filled out by Dr. Parnes leaves this line blank, while the report filled out by Dr. Akhtar states that plaintiff "cannot walk long distances or sit [for a] long time." Dr. Akhtar completed a subsequent progress report on September 21, 1995 stating that plaintiff "cannot work due to long travel and due to Rx cannot perform even administrative work." Reports filled out by Dr. Parnes on September 21, 1995, state that plaintiff's return date is "indeterminate" and that he is "totally disabled."

On September 12, 1995, plaintiff was required to report to Con Edison for a medical evaluation. At that evaluation, the Con Edison staff doctor noted the surgery on both knees and concluded, without stating to which knee he [*6] was referring, that plaintiff's "knee joint" was normal in appearance. Plaintiff was then referred to an outside orthopedic consultant, Dr. Nate Bondi. Plaintiff states that he was given a sealed envelope to take to Dr. Bondi and that Dr. Bondi examined him on September 18, 1995, for approximately a minute by asking plaintiff to raise and lower his leg. Plaintiff was then given a sealed envelope by Dr. Bondi to take to Con Edison. Dr. Bondi reported that plaintiff "will be able to return to work on [September 18, and] may do administrative work."

Plaintiff's Physician

During this time, plaintiff was also meeting regularly with his treating physician, Dr. Akhtar. Dr. Akhtar was treating plaintiff for his knee injuries, but

1999 U.S. Dist. LEXIS 10899, *

also noticed during the course of his treatment that plaintiff was experiencing extreme loss of weight and memory problems, which conditions he believed were being treating by another physician. On September 7, 1995, Dr. Akhtar recorded that

> patient cannot sit . . . [he is] still disabled totally. . . . Right knee is now worse than the left. Range of motion, right side, zero to 80 degrees. Left was zero to 85. Wound okay.

On September 18, 1995, Dr. [*7] Akhtar reported that

> patient with bilateral knee derangement doing about the same. . . . Patient still has pain and stiffness of the leg, right worse than the left. Patient still . . . losing weight, unexplainable so far. Loss of memory and loss of concentration. Has to drive 60 miles one way [to his] place of work, I believe. . . . Work-up for weight loss and loss of concentration, . . . to be referred back to his medical person.

After a visit on September 21, 1995, Dr. Akhtar recorded the following:

> Bilateral internal derangement persists. Patient has been getting physical therapy work-up for the loss of weight, and loss of memory continued. Patient is unable to return to work due to long-distance travel. Knee stiffness, loss of concentration, inability to concentrate. Bilateral knee atrophy of quadriceps, locally tender, medial side. No gross effusion. Diagnosis at that point was post-traumatic degenerative arthritis, depression, loss of weight.

On October 19, 1995, after another visit, Dr. Akhtar reported that plaintiff

> remains disabled. Patient is still not fully recovered from the right knee operation. Range of motion limited with pain [*8] using cane. Stiffness of the knees persist. Patient cannot drive independently. Complains of loss of concentration, depressed, loss of weight. I believe work-up is in progress. Rx given. Note for the job given.

At subsequent visits, Dr. Akhtar reported little change in plaintiff's condition. In his deposition, Dr. Akhtar admitted that during this period, he did not know what plaintiff's job duties were at Con Edison. He also stated that "about 50 to 60 percent" of his decision that plaintiff was unable to work was based on plaintiff's knee condition and he said that if his decision had been based on "just the knees," he "would say that the knees are okay for him to work, as long as his brain is with him. . . ."

Plaintiff's Termination

On September 20, 1995, plaintiff had a follow-up visit with the Occupation Health Department of Con Edison and was informed that he had been approved to return to work the following day, with the restriction that he could only do sedentary work for thirty days. n3 Plaintiff did not report for work. On October 19, Con Edison received a report from Dr. Akhtar stating that the date on which plaintiff could return to work with restrictions [*9] was still undetermined. The Medical Director of Con Edison, Dr. Dara P. Richardson, immediately spoke on the telephone with Dr. Akhtar. Her contemporaneous handwritten notes indicate that Dr. Akhtar informed her there was no medical condition preventing plaintiff from returning to work and that the only reason he stated that plaintiff's return date was undetermined was because plaintiff asked him to do so since he lived sixty miles from the job site. Dr. Richardson informed him that duty status evaluations are not based on the distance an employee travels to work. In his deposition, Dr. Akhtar did not deny the conversation, but stated that he remembered no such conversation.

> n3 On September 28, 1995, before becoming aware of this determination, Emily Lind of the Con Edison Employee Relations Department sent plaintiff a letter stating that his sick allowance benefits would expire on November 23, 1995, and that his employment would be terminated on December 1, 1995, if he was "unable to be medically approved for duty and return to work by November 23, 1995. . . ."

[*10]

That same day, on October 19, 1995, plaintiff's supervisor, Andrew Camera, spoke to plaintiff and told him that since he had been placed back on duty as of September 21, 1995, his employment would be terminated if he did not report to work or obtain approval from the medical department for additional sick time. Camera also sent plaintiff a hand-written letter stating that plaintiff had been "AWOL" n4 from his job since

September 21, 1995, and that "if you do not report to work by Oct. 23, 1995, 7 AM at your normal work location, you will have been considered to have abandoned your job and terminated your employment with the company."

n4 Con Edison defines "AWOL" as "absent without authorization."

Plaintiff appeared for a follow-up medical visit at Con Edison on October 20, 1995. Plaintiff was seen by a Con Edison staff doctor and Dr. Richardson. Plaintiff's on duty status was continued, with the same temporary sedentary work restriction. Nonetheless, plaintiff still did not return to work. Dr. Richardson informed [*11] plaintiff that there was no medical justification for him to continue off duty and that he was expected to return or his department would consider him AWOL. During this period, on October 23, 1995, Dr. Akhtar sent a memorandum to Con Edison indicating that plaintiff had been under his care since April 1995 and that

patient is loosing [sic] weight and complains of tremor disturbance. Patient also has to travel over 60 miles one way to get to work. With all [these] findings he cannot work for undetermined time.

Since April 20, 1995, plaintiff's status had been reviewed on a regular basis by Con Edison's disability panel. Through September 21, 1995, those panels regularly continued plaintiff's sick leave status. On that day, the panel extended plaintiff's accumulated sick leave through November 23, 1995, but recommended termination effective December 1, 1995. On October 20, 1995, the panel met again and rescinded its September 21, 1995 decision. Instead of recommending termination and continuing plaintiff's sick pay, the panel stated that plaintiff was approved for duty effective September 21, 1995.

Around October 31, 1995, Emma Lind of the Con Edison Employee Relations [*12] department called plaintiff and informed him that, since he had been approved for duty by the Medical Department as of September 21, 1995, and had not returned to work, he was "AWOL". She directed plaintiff to return to work on November 1, 1995, and told him that if he did not, his employment would be terminated. On November 1, 1995, Ms. Lind sent plaintiff a letter stating that:

This letter will confirm our telephone conversation on October 31, 1995 in which I informed you that you have been approved for duty with temporary

restrictions by the Occupational Health Department since September 21, 1995. Since that date, you have been absent without authorization (AWOL). On October 31, 1995, you were directed to return to work on November 1, 1995. You failed to comply with this management directive by not reporting to work on November 1, 1995.

You are hereby informed that your services with Con Edison are terminated effective November 1, 1995. In addition, your failure to report to work since September 21, 1995 is being recorded as unauthorized absence and we will seek recovery of the monies paid to you.

On November 6, 1995, Con Edison also completed a "Notice of Termination [*13] of Employment." That form shows that plaintiff's employment was terminated effective November 1, 1995, for "Insubordination" since he failed to comply with a management directive and was AWOL. It is noteworthy that there is no evidence in plaintiff's medical file of any awareness by Con Edison that plaintiff was suffering from dementia or other conditions, and that the sole medical basis for Con Edison's determinations was the condition of plaintiff's knees.

Allegations of Discrimination

In his deposition, plaintiff was unable to identify anyone at Con Edison in particular who discriminated against him with respect to his termination and instead blamed Con Edison as a whole and "the process." In response to repeated questions, plaintiff could give no specific facts suggesting any discrimination on the basis of age or disability at all. In an affidavit submitted in connection with his papers in opposition to this motion, plaintiff alleges that, at the time of his firing,

the top management of the company had developed a program and practice of forcing senior long-time managerial employees to accept, or be fired, on the basis of excuses which were what I have been told [*14] were "pre-textual," or false reasons. I was exactly 48 years old on the day I was fired, November 1, 1995.

Nonetheless, the only specific allegation of discrimination made by plaintiff, unsubstantiated by any admissible evidence, is that the CEO of Con Edison, "made numerous speeches to groups of higher level managerial employees that the company had to move

older managers out, to be replaced by younger people." As a result, plaintiff concludes

> there is strong evidence of this policy and practice which is being submitted on my behalf in these motions [sic] proceedings. There is no doubt that my firing was motivated in substantial part by reason of my age, in violation of the federal and state laws prohibiting age discrimination in employment.

Plaintiff has also presented the depositions of two former Con Edison employees from their own suits against Con Edison in this district who contend that they were victims of discrimination. Nonetheless, there is no factual connection between the terminations described in those depositions and the termination of plaintiff, such as a similar pattern leading up to the termination or a similar position within Con Edison, that [*15] might permit an inference of discrimination against plaintiff. n5 Plaintiff alleges that Con Edison decided to terminate him as early as September 21, 1995, when Dr. Richardson prepared and signed a "Report for Disability Panel Review and request for Panel Action" recommending termination effective December 1, 1995.

> n5 Specifically, the deponents were the general manager of electric operations and the general operating supervisor in Westchester.

## LTD Plan

As a Con Edison management employee, plaintiff participated in the Con Edison Long-Term Disability Plan for Management Employees ("LTD Plan"). The LTD Plan is an employee benefit plan that was established by Con Edison to provide long-term disability benefits to its employees. The LTD Plan is fully insured by Met Life pursuant to a group insurance policy. Con Edison pays Met Life the full cost of the basic option and the difference between the employee contribution and the total premium charged by Met Life for the Premium and Standard options.

The Options [*16]  Summary Plan Description ("SPD") is the LTD Plan document. It was sent to participants in July 1992. It contains the terms or summaries of the terms for a number of welfare benefits offered through Con Edison's cafeteria plan. The SPD also contains the following language with respect to its scope: "if there is any conflict between this guide and the official plan documents and insurance contracts, the official documents and contracts will govern." Although some of the other welfare plans described in the SPD had

other plan documents, the SPD is the only plan document for the LTD Plan. According to the LTD Plan section of the SPD, to determine benefit eligibility, Con Edison will determine whether an eligible employee is "totally disabled." According to the SPD,

> for purposes of Con Edison's determination process, "totally disabled" means that you cannot do your job because of a sickness or injury for which you are under a doctor's care.

(Emphasis supplied.) A determination by Con Edison makes the participant eligible for benefits during the time from which he or she first became disabled until the date benefits are payable and then for the first 24 months for which [*17] benefits are payable. LTD benefits are first payable on the later of the following two dates: when an employee exhausts his or her sick-pay benefit or after 21 weeks.

After benefits have been paid for 24 months, Met Life then determines whether the employee is eligible for further benefits. Again, as explained in the SPD,

> at that time, "total disability means that you are unable to work in any gainful occupation for which you are reasonably qualified by education, training or experience, because of a sickness or injury for which you are under a doctor's care.

(Emphasis supplied.) In making benefit determinations, the LTD Plan vests both Con Edison and Met Life with discretionary authority:

> In carrying out their respective responsibilities under the plans, the plan administrator and claims administrators have discretionary authority to interpret the terms of the plans and to determine eligibility for an entitlement to plan benefits in accordance with the terms of the plans. Any interpretation or determination made pursuant to such discretionary authority will be given full force and effect, unless it can be shown that the interpretation was arbitrary and [*18] capricious.

At the time of his termination, plaintiff was enrolled in Option A, the Premium LTD Plan, which provides coverage of 60% to 70% of salary, plus a cost-of-living adjustment. Plaintiff has filed one claim for long-term disability benefits on October 24, 1995. n6 That form