**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-------------------------------------------------- x

TODD A. BENNETT,

     Plaintiff,

v.

                                Civil Action No. 3:02CV02299 (AWT)

AETNA LIFE INSURANCE  COMPANY,

     Defendant.

--------------------------------------------------x

**RULING ON MOTION FOR SUMMARY JUDGMENT**

The plaintiff brings this complaint pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461, seeking to recover benefits for partial disability denied by defendant Aetna Life Insurance Company ("Aetna"). Aetna has moved for summary judgment, arguing that the substantial medical record establishes that the plaintiff has no right to benefits for either total or partial disability. For the reasons set forth below, Aetna's motion is being granted.

**Part I.  Factual Background**

On August 17, 1992, the plaintiff began working for Accenture, LLP ("Accenture") as a computer consultant. His job duties included designing, testing and implementing complex business computer systems. On August 4, 1997, the plaintiff stopped working for Accenture, stating that he was experiencing muscle fatigue, allergies and an inability to concentrate. The plaintiff was diagnosed as suffering from copper toxicity.

-1-

The plaintiff applied for total disability benefits under a group long term disability policy issued by Aetna to Accenture. That group long term disability policy defined "total disability" as the inability "[d]uring the first 5 years of disability to perform the material duties of the employee's own occupation." (Group Disability Policy (Doc. # 24) at G-17.) At the end of five years, a claimant is required to prove an inability "to work at any occupation for which such employee is, or may reasonably become, fitted by education, training or experience." (Id.) On August 30, 1997, Aetna accepted the plaintiff's application for total disability benefits, and from July 6, 1997 until April 4, 2002, it continuously paid the plaintiff monthly benefits. Aetna advised the plaintiff that it would periodically re-evaluate his eligibility based on updated medical information and that in April of 2002 the disability plan would require him to meet the more stringent "any occupation" portion of the definition of disability.

In 2001, Aetna conducted a medical and vocational review of the plaintiff's condition to determine whether he remained disabled. As part of this review, Aetna received updated medical information from the plaintiff's treating physicians, Dr. Glenn Cart, Dr. William Petit and Dr. Robban Sica. Dr. Cart, a dermatologist, completed a Physical Capacities Evaluation ("PCE") on January 15, 2001, which concluded that the plaintiff was capable of a sedentary exertion level. Dr. Sica, on the other hand, submitted a PCE on January 18, 2001, which stated that the plaintiff had a less than sedentary exertion level. Dr. Petit deferred providing a report pending the completion of a comprehensive examination that the plaintiff was undergoing at Gaylord Hospital. However, Dr. Petit performed blood tests on the plaintiff which were normal and revealed no elevated copper levels from the period of March of 2000 to January of 2001.

Subsequently, Dr. Petit forwarded the plaintiff's evaluation by Gaylord Hospital to

Aetna.  These records indicated that in January of 2001, physicians at Gaylord Hospital had

performed comprehensive physical and neuropsychological evaluations of the plaintiff.  The

physical examination was conducted by Dr. Jerrold Kaplan, the Hospital's Vice-President and

Medical Director.  After obtaining a history from the plaintiff and conducting a physical

examination, Dr. Kaplan concluded that, although the plaintiff still had "significant fatigue, he

ha[d] made dramatic progress" and that it was "appropriate for him to gradually return to the

workforce."  (Administrative Record ("AR") (Doc. # 23) at 231.)  Dr. Kaplan recommended that

the plaintiff  "start by working four hours per day three days per week and advance as tolerated."

(AR at 231-32.)

The neuropsychological examination was conducted by Dr. Donna Henderson, also from

Gaylord Hospital.  Dr. Henderson's report stated that the results were "almost entirely positive

and indicate[d] that Mr. Bennett [was] . . . functioning at a level that [was] commensurate with

his estimated pre-morbid abilities."  (AR at 254.)  Her report also indicated that the plaintiff had

demonstrated "high average to superior basic attention, visuo-spatial skills, language abilities,

memory, general intelligence and higher order 'problem solving' skills."  (Id.)  Although the

plaintiff was found to exhibit "average mental control and concentration, as well as *slightly*

asymmetric performance on motor tasks with his non-dominant side", Dr. Henderson concluded

that these findings reflected, at best, "a very subtle decline in performance in these areas, and

[were] unlikely to present significant difficulties for him in his daily functioning."  (Id.)

The neuropsychological report also noted that the plaintiff had not sustained "any obvious,

or permanent cognitive deficits as a consequence of his copper toxicity."  (Id.)  The report stated

that the plaintiff "exhibited no signs of fatigue or declining performance during his three and a half

hour evaluation" and that "[i]ndeed, he continued to perform at a high average to superior level on repeated cognitive tasks." (Id.) Moreover, the report stated that "[s]uch observations [were] considered a good prognostic indicator for his ability to gradually return to work", and that the plaintiff was capable of returning to work on a limited basis and should begin "working about two hours a day and then gradually increase his workload as tolerated." (AR at 255.) The plaintiff underwent physical therapy at Gaylord Hospital until February 1, 2001, and then he was discharged with no further treatment recommended.

In July of 2001, Aetna referred the plaintiff's file for review to Dr. Daniel LoPreto, a clinical psychologist. Dr. LoPreto concluded in a report dated July 17, 2001, that "[o]bjective testing revealed that Mr. Bennett [was] currently functioning at a level that [was] commensurate with his estimated premorbid abilities." (AR at 159.) Dr. LoPreto noted that the testing performed by Gaylord Hospital showed that the plaintiff demonstrated "high average to superior basic attention, visuo-spatial skills, language abilities, memory, general intelligence and higher order problem-solving skills", that he had exhibited no signs of fatigue or declining performance during the lengthy examination and that the plaintiff was no longer undergoing chelation therapy because all of the copper had been removed from his system. (Id.) Dr. LoPreto concluded that the existing documentation "fail[ed] to reveal any cognitive deficits in the present that would preclude [the plaintiff's] ability to function in a competitive work environment." (AR at 160.)

Aetna also referred the plaintiff's file to Dr. James Cole, a consulting physician, for review. After reviewing the reports of the plaintiff's physicians, Dr. Cole observed, in a report dated August 3, 2001, that the plaintiff had normal urine copper levels, that Dr. Kaplan from Gaylord Hospital had reported that the plaintiff was "well now" and could return to work, and

that Dr. LoPreto had concluded that the plaintiff had no signs of cognitive dysfunction and exhibited above average intelligence and high-to-superior attention span. (AR at 155.) Dr. Cole concluded that the available data established that the plaintiff had "an unrestricted physical capacity with the only restriction being avoidance of close contact with volatile or liquid chemicals such as copper, mercury, hydrocarbons." (AR at 156.) In an estimate of physical capacities, Dr. Cole stated that the plaintiff had the physical capacity to engage in a heavy exertion level with minimal limitations and could work a 40 hour workweek. Dr. Cole also concluded that the plaintiff appeared to have attained maximum medical improvement and was able to stand, sit or walk up to eight hours per day during a typical working schedule, assuming that he was able to change positions as needed.

Aetna sent the reports of Dr. LoPreto and Dr. Cole to Dr. Petit, Dr. Sica and Dr. Kaplan for review and comment. Dr. Petit did not agree or disagree with the review. Dr. Sica, on the other hand, responded on August 20, 2001, that she "strongly disagree[d]" with Dr. Cole's recommendation of a 40 hour workweek at that time. (AR at 115-16.) She stated that the plaintiff's copper level was no longer toxic but that he still experienced an "aftermath of symptoms", including a "reduced concentration capacity and limited mental and physical stamina." (AR at 116.) She concluded that the plaintiff could return to work initially three days per week, three hours per day and that he would be able to increase his hours gradually with the hope of eventually returning to work full-time. Dr. Kaplan reported by letter dated August 21, 2001 that the plaintiff had been seen that day for re-evaluation at Gaylord Hospital. He stated that, in his medical opinion, the plaintiff was " now able to return to work four hours per day, five days per week", and he recommended that the plaintiff increase his work hours by one hour per day each

week, so that he would be working 40 hours per week at the end of one month.  (AR at 142.)

Aetna then forwarded the letters from Dr. Petit, Dr. Sica and Dr. Kaplan to Dr. Cole, its medical consultant, for review.  After reviewing the letters, Dr. Cole submitted a medical consult report stating that he agreed with Dr. Kaplan that the plaintiff could "return to work in gradual increments over the next month."  (AR at 131.)  He also noted that Dr. Sica had indicated that the plaintiff was successfully treated for copper toxicity.

While the reviews were being done, the plaintiff informed Accenture and Aetna that he was able to return to work on a part-time basis.  Accenture did not offer the plaintiff a part-time position, which led the plaintiff to search for a part-time position elsewhere.  The plaintiff eventually found such a position at Harley Bennett Avionics, Inc.  The plaintiff started a three-month period of unpaid training with Harley Bennett Avionics on November 1, 2001, working schedule of five days per week, four hours per day, which was to be increased based on his health and performance.

Aetna referred the plaintiff's case to a certified rehabilitation counselor to assess his vocational abilities.  The rehabilitation counselor did not see the plaintiff's entire file, but rather only received the two reports from Aetna's medical consultants, Dr. LoPreto and Dr. Cole.  In a report dated January 9, 2002, the counselor identified a sampling of occupations for which the plaintiff was qualified based on his education and experience in the information technology and consulting industry.  These included positions as a Systems Analyst, a Consultant, a Logistics Specialist and an Information Scientist.  All of these positions were considered sedentary in nature and with earnings commensurate to the plaintiff's disability income.

By letter dated January 30, 2002, Aetna informed the plaintiff that based on the available medical and vocational documentation, it had determined that he was not disabled under the "any occupation" standard of disability that became effective in April of 2002. Aetna advised the plaintiff that it would deny disability benefits April 7, 2002 and released his payments through April 4, 2002.

Based on Aetna's decision, the plaintiff's wife wrote a letter, dated February 21, 2002, requesting that "if Todd's condition has not improved to a 40-hour workweek by the April 4th date noted in your letter, that partial benefits apply." (AR at 42.) This letter was treated by Aetna as an appeal. In addition, by letter dated March 5, 2002, Dr. Sica informed Aetna that she had re-evaluated the plaintiff on March 4, 2002, and that she had concluded that "[i]n the past year, he has gradually improved and has been able to return to work on a part-time basis." (AR at 56.) Dr. Sica stated, however, that because "fatigue impair[ed] his concentration and attention span after 4 hours", she believed the plaintiff was limited to a four-hour workday. (Id.)

On August 22, 2002, Aetna denied Mrs. Bennett's appeal. Aetna explained that the only support provided by the plaintiff for his disability claim was Dr. Sica's assessment that he was partially disabled by fatigue, and it was not "objectively correlated by clinical medical evidence." (AR at 6.) Aetna also noted that, by comparison, the plaintiff's physical and neurological testing at Gaylord Hospital had demonstrated that he was functioning in the superior range of general intellectual abilities, that he exhibited no signs of fatigue and that he had no permanent cognitive deficits as a result of his copper toxicity, among other conclusions. Aetna concluded that the plaintiff had not established that he satisfied the definition of disability under the plan and that April 4, 2002 he ceased to be entitled to either total or partial disability benefits.

**Part II. <u>Legal Standard</u>**

A motion for summary judgment may not be granted unless the court determines that

there is no genuine issue of material fact to be tried and that the facts as to which there is no such

issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). <u>See</u>

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Gallo v. Prudential Residential Servs.</u>, 22

F.3d 1219, 1223 (2d Cir. 1994). Rule 56(c) "mandates the entry of summary judgment . . .

against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." <u>See</u>

<u>Celotex Corp.</u>, 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of

the jury. The court, therefore, may not try issues of fact. <u>See, e.g.</u>, <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 255 (1986); <u>Donahue v. Windsor Locks Bd. of Fire Comm'rs</u>, 834 F.2d 54,

58 (2d Cir. 1987); <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir.

1975). It is well established that "[c]redibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of the judge."

<u>Anderson</u>, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether

there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is

confined . . . to issue-finding; it does not extend to issue-resolution." <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and

related to a material fact. Therefore, the mere existence of some alleged factual dispute between

the parties will not defeat an otherwise properly supported motion for summary judgment. An

issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. As the court observed in Anderson, "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. at 248. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact", Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted. The question then becomes whether there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. See Anderson, 477 U.S. at 248, 251.

**Part III.  Discussion**

"ERISA does not set out the applicable standard of review for actions challenging benefit eligibility determinations." Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 49 (2d Cir. 1996). Consistent with trust law, a denial of benefits challenged under ERISA is to be reviewed under a *de novo* standard, unless the plan grants the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan. Firestone Tire and Rubber v. Bruch, 489 U.S. 101, 115 (1989). Thus, to determine what standard to apply to a plaintiff's challenge to a denial of benefits, a court must determine whether the plan confers discretionary authority on the plan's administrator. Kocsis v. Standard Ins. Co., 142 F.Supp. 2d 241, 251 (D.

-10-

Conn. 2001).  "When an employee benefit plan grants a plan fiduciary discretionary authority to

construe the terms of the plan, the court may reverse only if the fiduciary's decision was arbitrary

and capricious."  Id. (citing Rombach v. Nestle USA, Inc., 211 F.3d 190, 194 (2d Cir. 2000)).

"More specifically, 'where the plan reserves such discretionary authority, denials are subject to the

more deferential arbitrary and capricious standard, and may be overturned only if the decision is

'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  Id.

(citing Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999)).

       In order to establish that the arbitrary and capricious standard of review is applicable, the

plan administrator must point to language in the plan "stating that the award of benefits is within

the discretion of the plan administrator or language that is plainly the functional equivalent of such

wording."  Kinstler, 181 F.3d at 252.  The provisions of the disability plan at issue here satisfy this

requirement because they expressly confer discretionary authority on Aetna, the plan

administrator.  The provisions of Accenture's Summary Plan Description ("SPD") accompanying

the long term disability plan contain the following language:

> The Plan is administered by Accenture or its designated representative.  Accenture is
> responsible for formulating and carrying out all rules and regulations necessary to
> administer the Plan and has the sole discretionary authority to make factual
> determinations and decisions regarding eligibility of employees and participants in the
> Plan.    Accenture has delegated to one of more Claims Administrators the
> discretionary authority to make decisions regarding the interpretation or application
> of Plan provisions, and the discretionary authority to determine all questions,
> including factual determinations, as to the rights and benefits of employees and
> participants under the Plan.  Benefits under the Plan will be paid only if the Plan
> Administrator and/or Claims Administrator decide in its discretion that the claimant
> is entitled to them.  Any decision made by Accenture or a Claims Administrator in
> good faith is final and binding on all persons.  The Claims Administrator for the Long
> Term Disability Plan is Aetna Life Insurance Company.

(SPD (Doc. # 24) at 1.)  The SPD also provides that a claimant will be considered totally disabled

-11-

only if "your doctor and the Claims Administrator agree that you are unable to perform all of the

material and substantial duties of your own occupation" and that a claimant will be considered

partially disabled only if "your doctor and the Claims Administrator agree that (i) you can perform

one or more, but not all, of the material and substantial duties of your own occupation on a full-

time or part-time basis; or (ii) some or all of the duties of another occupation on full-time or part-

time basis . . . . (SPD at 3.)

       This language expressly confers sole discretion on Aetna, as claims administrator of the

plan, to make "final and binding" factual determinations and decisions regarding eligibility for

benefits and interpretations of plan provisions.  Therefore, it is sufficient to make applicable the

arbitrary and capricious standard of review.  See Pagan v. NYNEX Pension Plan, 52 F.3d 438,

442 (2d Cir. 1995) (plan provisions stating that plan administrator retains "right, authority and

discretion" to apply plan confers arbitrary and capricious standard); Kocsis v. Standard Ins. Co.,

142 F. Supp. 2d 241, 252 (D. Conn. 2001) (arbitrary and capricious review applied to plan that

reserved to insurer exclusive authority to interpret group policy and resolve all questions arising in

the administration, interpretation and application of the policy).

       Thus, the key question is whether the denial of benefits by Aetna was without reason,

unsupported by substantial evidence or erroneous as a matter of law, or otherwise arbitrary and

capricious.  See Kinstler, 181 F.3d at 249.  "Under this deferential standard, the court is 'not free

to substitute [its] own judgment for that of the [Plan's administrator] as if [it] were considering

the issue of eligibility anew.'"  Kocsis, 142 F. Supp. 2d at 252 (citing Pagan, 52 F.3d at 442).

"The court may not upset a reasonable interpretation by the Administrator."  Pagan, 52 F.3d at

442.

The administrative record shows that Aetna conducted a thorough review of the plaintiff's condition before terminating his benefits for total disability and denying his benefits for partial disability.  Aetna began paying the plaintiff benefits in July of 1997.  As part of its review of the plaintiff's case in 2001, Aetna obtained updated medical information from the plaintiff's treating physicians, Dr. Cart, Dr. Petit and Dr. Sica, as well as the evaluations of the independent physicians from Gaylord Hospital, i.e. Dr. Kaplan and Dr. Henderson, who had conducted comprehensive physical and neuropsychological examinations of the plaintiff.  Aetna had the plaintiff's case reviewed by two consultants, Dr. LoPreto and Dr. Cole, and sent their reports to the plaintiff's treating physicians for review and comment.  Aetna also had the plaintiff's case reviewed by a certified rehabilitation counselor.

Aetna's conclusion that the plaintiff was not disabled under the "any occupation" standard in the plan was based on the opinions of Dr. Kaplan, Dr. LoPreto and Dr. Cole, all of whom had concluded that the plaintiff was ready to return to work, on a gradual basis, so that he would be working full-time by no later than the end of September of 2001.  The fact that Dr. Sica disagreed with the opinions of the other physicians does not indicate that Aetna disregarded objective evidence, as argued by the plaintiff, and it does not render Aetna's denial of benefits one that was without reason, unsupported by substantial evidence or erroneous as a matter of law, or otherwise arbitrary and capricious.  See Kocsis, 142 F. Supp. 2d at 253.  Thus, the court concludes that Aetna's interpretation is a reasonable one that should not be upset by the court.

**Part IV.  Conclusion**

For the reasons set forth above, Aetna's Motion for Summary Judgment  (Doc. # 20) is hereby GRANTED.

-13-

The Clerk shall close this case.

It is so ordered.

Dated this 29th day of September 2005, in Hartford, Connecticut.

/s/ AWT

_____

Alvin W. Thompson
United States District Judge